NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STRATEGIC PRODUCTS AND SERVICES, LLC, | |
| *Plaintiff,* | Civil Action No. 18-00694 (KSH) (CLW) |
| v. | |
| INTEGRATED MEDIA TECHNOLOGIES, INC., | **OPINION** |
| *Defendant.* | |

**Katharine S. Hayden, U.S.D.J.**

## I.    Introduction

In 2012, plaintiff Strategic Products and Services ("SPS"), a software technology company that specializes in interconnected telecommunications systems, networking, and collaboration technology solutions, acquired Providea Conferencing, LLC ("Providea"), a nationwide provider of comprehensive video conferencing solutions, for the purpose of increasing its competitiveness in the video conferencing market.  Following the acquisition, Todd Luttinger, Providea's president and CEO, assumed the position of senior vice president of SPS's Providea business unit.  SPS fired Luttinger in February 2015, and 13 months later, Luttinger went to work for a competitor, defendant Integrated Media Technologies ("IMT").  Not too long afterwards, other members of SPS's Providea business unit, including SPS's HR director, migrated over to IMT.

SPS has sued IMT alleging several common law business torts. IMT now moves to dismiss the second amended complaint ("SAC") on grounds that this Court lacks subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and lacks personal jurisdiction over IMT under Fed. R. Civ. P. 12(b)(2); alternatively, IMT argues that SPS has failed to allege causes of action upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). (D.E. 37.)[1]

The Court held oral argument on April 16, 2019. Prior to oral argument and after briefing had concluded, SPS filed two letters with attached exhibits on the docket dated April 9 and April 11. (D.E. 59, 60.) The exhibits came from post-briefing discovery, and included emails that demonstrated that IMT was using SPS employees to conduct its business while they were still under SPS's employ, bolstering SPS's intentional tort claims and supporting SPS's contention that this Court has personal jurisdiction over IMT. At oral argument, the Court explained why it would consider these submissions, but halted the submission by either side of any further information gleaned from ongoing discovery and directed the parties to take a pause from their discovery obligations pending this decision.

**Factual Background**

The SAC alleges the following. For the purposes of deciding IMT's motion to dismiss under both Rule 12(b)(2) and 12(b)(6), the Court is required to accept SPS's allegations as true. *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

SPS is a limited liability company headquartered in Parsippany, New Jersey. (SAC ¶¶ 1, 13.) It provides "hi-tech communications systems and networking solutions—including

---

[1] The SAC alleges that the Court has diversity jurisdiction which is not in dispute.

integration, cloud support and disaster prevention and recovery services—to multi-national clients throughout the world." (*Id.* ¶ 13.)

SPS has approximately 650 employees, the majority of whom worked in SPS's New Jersey headquarters during the relevant time. (*Id.* ¶ 15.) All SPS employees, "remote or otherwise . . . reported to SPS's New Jersey headquarters," where SPS's payroll and benefits were also administered. (*Id.* ¶ 7.) Additionally, "employees' employment contracts, handbook acknowledgements, general business and SPS's [c]onfidential [i]nformation" were maintained at SPS headquarters "via hard copy and electronic servers." (*Id.*) SPS also hosted its sales meetings at headquarters. (*Id.*)

In October 2012, SPS acquired Providea to "establish [SPS's] capabilities and expertise in the video conferencing market." (*Id.* ¶ 16.) SPS executed new employment agreements with the Providea employees, including Providea's president and CEO, Todd Luttinger. (*Id.* ¶¶ 17-18.) Luttinger became the senior vice president of SPS's Providea business unit. (*Id.* ¶ 18.) His employment agreement included a provision barring competition and solicitation of customers, employees, and business associates for a two-year period following the conclusion of his employment. (*Id.* ¶ 21.)[2] Additionally, the agreement contained a confidentiality clause

---

[2] IMT attaches to its motion to dismiss an alternative version of Luttinger's employment contract. (D.E. 37-2, Ex. C.) At oral argument, SPS disputed that IMT's proffered version governed. "In deciding a Rule 12(b)(6) motion, a court must consider only . . . undisputedly authentic documents if the complainant's claims are based on these documents." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (citations omitted). That is decidedly not the case here, and the Court must therefore rely on the version relied on in the SAC. *See Group Against Smog and Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127-28 (3d Cir. 2016) (finding that the document attached to defendant's motion to dismiss was undisputedly authentic where neither party questioned its authenticity).

prohibiting use or disclosure of confidential information "during the [t]erm of [e]mployment and at any time thereafter." (*Id.* ¶ 21.)

SPS fired Luttinger on February 28, 2015. (*Id.* ¶ 22.) According to the SAC, shortly thereafter, "if not sooner," IMT "began to develop and implement its unlawful scheme to pirate away SPS's video conferencing business unit." (*Id.* ¶ 32.)

An SPS competitor, IMT also provides "high-tech communications systems and networking solutions"; however, SPS alleges that "until recently IMT's business operations were limited to two principal business segments—a Consulting and Systems Integration Business, and IT services," and did not include a unit "dedicated to video conferencing solutions." (*Id.* ¶¶ 29-30). SPS alleges that IMT acted on its desire to develop a video conference unit by unlawfully "pirat[ing] away SPS's Providea Conferencing, LLC business unit, thus gaining near-immediate access to SPS's expertise, [c]onfidential [i]nformation, contractual advantageous relationships, customers and business opportunities." (*Id.* ¶ 31.) SPS claims that by late 2015, Luttinger "openly bragged about establishing 'Providea 2.0' at IMT." (*Id.* ¶ 33.)

IMT formed a new business segment called the "Video Collaboration Business Unit" and hired Luttinger to be the president, with his official employment starting in Mach 2016. (*Id.* ¶¶ 34, 36.) SPS alleges that IMT was aware that Luttinger was subject to restrictive covenants when IMT hired him and "actively encouraged Luttinger to breach" those restrictions. (*Id.* ¶¶ 35-36.) SPS asserts that Luttinger immediately began to poach employees from SPS's Providea business unit, and worked with Teri Bevan, who at the time was SPS's human resources director, to bring both Bevan "and a vast number of SPS employees" onboard at IMT. (*Id.* ¶¶ 37, 38.)

Bevan resigned from SPS on January 29, 2016. (*Id.* ¶ 39.) She was subject to a one-year non-solicitation agreement that barred her from "solicit[ing], recruit[ing], encourag[ing] or

induc[ing] any employee, consultant or independent contractor of [SPS] to leave the employ of [SPS] or to terminate an engagement with [SPS]." (*Id.* ¶ 40.) SPS alleges that IMT, through Luttinger and Bevan, knew that Bevan's agreement with SPS contained a non-solicitation restrictive covenant and, as it did with Luttinger, "actively encouraged Bevan to breach that covenant, which Bevan did by soliciting other SPS employees to leave SPS for IMT." (*Id.* ¶ 41.) SPS asserts that "over the ensuing months, IMT, through the efforts of Luttinger, among others, proceeded to raid no fewer than eighteen (18) additional employees from SPS and its video conferencing business unit." (*Id.* ¶ 42.)

The SAC identifies the additional 18 SPS employees that IMT poached by name, and includes their positions at SPS, the date each terminated employment with SPS, and what, if any, restrictive covenant agreements were in place. (*Id.* ¶¶ 43-85.) In addition to Luttinger and Bevan, SPS alleges that seven of the employees who defected to IMT were subject to a one-year non-solicitation agreement: Bernadette McCool (*id.* ¶ 44), Mary Cincotta (*id.* ¶ 51), Michael Kinney (*id.* ¶ 55), Rebecca Rains (*id.* ¶ 60), Douglas Bevan (*id.* ¶ 71), Mark Donnelly (*id.* ¶ 74),[3] and Paul Cahill (*id.* ¶ 79).

SPS notes that its confidentiality and non-solicitation agreements with Michael Kinney and Rebecca Rains contained the following New Jersey choice of law and forum selection clause:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey and that either the United States District Court for the District of New Jersey or the Superior Court of New Jersey shall be the sole and exclusive forum for the resolution of all disputes and controversies arising under or relating to this Agreement. Employee agrees to submit to the personal jurisdiction of the aforementioned courts and waives and release[s] any claim or right Employee may have to transfer to a court in any other state any lawsuit,

---

[3] In Terri Bevan's declaration, submitted in support of IMT's motion to dismiss, she states that Mark Donnelly never worked for IMT. (D.E. 37-2, Ex. E at 116.) In oral argument, SPS's counsel acknowledged that while he believed that Donnelly had been solicited by IMT, he was advised that IMT did not hire him.

actions or proceeding related to the Agreement or Employee's employment with the Company.

(*Id.* ¶¶ 56, 61.) SPS contends that these provisions put IMT on notice that "any action arising out of . . . [a] breach of the Confidentiality and Non-Solicitation Agreement would be litigated in New Jersey." (*Id.* ¶¶ 58, 63.) SPS also alleges that one of the SPS employees IMT recruited, Damian Gryzb, lived and worked in New Jersey at the time IMT solicited him. (*Id.* ¶ 68.)

Additionally, SPS alleges that all SPS employees were subject to SPS's confidentiality policy contained in the employee handbook. (*Id.* ¶ 24.) SPS employees are required to "sign an acknowledgement of having received and reviewed the SPS policies [in the handbook]." (*Id.*) SPS alleges that IMT's "raiding conduct" targeted key personnel who had "knowledge of and access to SPS's [c]onfidential [i]nformation, business opportunities, client relationships and contacts" (*id.* ¶ 93), and that those employees who went over to IMT became "willing conspirators" in "IMT's plot to usurp SPS's business" (*id.* ¶ 100). IMT "actively encouraged and even rewarded former SPS employees to misappropriate and use SPS's [c]onfidential [i]nformation for the benefit of IMT" and to "divert . . . certain customer business opportunities away from SPS"—sometimes while the former SPS employees were still working for SPS. (*Id.* ¶¶ 102-03.)

Emails IMT turned over in March indicate that certain defected SPS employees were doing business on behalf of IMT prior to terminating their SPS employment. For example, on November 21, 2016, nine days prior to Ladd quitting her job at SPS, Luttinger emailed all IMT employees to welcome Ladd to the IMT team and announced she had "already sold a Cisco Video system" for IMT. (D.E. 60-1, April 11 Discovery, Ex. A.) In a December 12, 2016 email Luttinger states that he is in "RFP [request for proposal] mode with Steve, Swoyer, and Mike today for Blackstone"; Swoyer was employed by SPS until January 27, 2017. (D.E. 60-2, April

11 Discovery, Ex. B.)  Paul Kang emailed Luttinger on May 3, 2017 with an attached IMT quote

for a client; Kang did not leave SPS until two days later on May 5.  (D.E. 60-5, April 11 Discovery,

Ex. E.)

The April 11 discovery also contains emails that show SPS templates and other documents

being circulated by former SPS employees after they began working for IMT.  (*See* D.E. 60-6,

Ex. F; D.E. 60-9, Ex. I; D.E. 60-10, Ex. J.)

In sum, SPS claims that IMT has "effectively, albeit wrongfully, plundered SPS's

business, used SPS's [c]onfidential [i]nformation, and pirated SPS key employees . . . siphon[ing]

off SPS's business without spending any of the time or money that SPS spent to develop it."  (*Id.*

¶ 104.)  SPS alleges that IMT's actions have caused "a substantial diminution in [SPS's] ability

to compete in the marketplace," "a loss of revenues and business opportunities," and an erosion

of "SPS's reputation and the trust and confidence of the competitive marketplace."  (*Id.* ¶¶ 103,

105.)

The SAC alleges five torts: tortious interference with contractual and advantageous

relations, tortious interference with prospective economic gain, misappropriation of confidential

information, conversion, and unfair competition.

## II.  Discussion

### A.  IMT's Motion to Dismiss Under Rule 12(b)(1)

IMT moves to dismiss the SAC on the grounds that this Court lacks subject matter

jurisdiction, arguing that SPS does not have standing to sue because "SPS is the corporate parent

of Providea," and under the shareholder standing rule "may not bring claims for harm suffered by

its subsidiary."  (D.E. 37-1, Moving Br. 7-8.)

The party invoking federal jurisdiction bears the burden of establishing the Article III standing requirements, three elements that constitute "the irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The Supreme Court has held that "[e]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Relatedly, the shareholder standing rule "is a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).

In its opposition, SPS rejects IMT's application of the shareholder standing rule, and also claims that if it did apply, SPS would fall squarely within the rule's "well-established exception" where the shareholder has "a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." (D.E. 38, Opp. Br. 8-9, quoting *Franchise Tax Bd. of Cal.*, 493 U.S. at 336.)

The SAC alleges that IMT engaged in an unlawful scheme to "usurp, plunder and raid SPS's employees, and ultimately its customer base and business" and "to misappropriate SPS's confidential information." (SAC ¶ 8.) Each defecting employee named in the SAC was employed by SPS, not Providea. Importantly, the SAC asserts that because of IMT's conduct, SPS suffered significant injury to its business and reputation. (SAC ¶¶ 103-05.) While Providea may still exist

as a separate LLC—and IMT submits an annual report to this effect (*see* D.E. 37-2, Decl. in Support of MTD, Ex. B)—SPS employed the twenty people that allegedly defected to IMT.

At this stage, the Court finds SPS has sufficiently pled proper subject-matter jurisdiction. *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.") (internal citations omitted).

### B. IMT's Motion to Dismiss Under Rule 12(b)(2)

IMT, a California-based company incorporated in Delaware, presses hard on its alternative basis for dismissal: lack of personal jurisdiction under Rule 12(b)(2). State law defines the bounds of a federal district court's jurisdiction over persons. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). New Jersey's long-arm statute is coextensive with the limits imposed by federal due process. In *Daimler*, the Supreme Court reaffirmed that " '[t]he canonical opinion in this area remains *International Shoe* [*Co. v. Washington*, 326 U.S. 310 (1945)] in which we held that a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Id.* at 126 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)).

Personal jurisdiction can be either general or specific. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, n. 8–9 (1984). A court may assert general jurisdiction over a foreign defendant when the defendant's contacts with the forum are "so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 564 U.S. at 919.

SPS expressly pleads specific jurisdiction, however, and there is no dispute that that is the appropriate lens through which to view the issue of jurisdiction.

Specific, or "case-linked" jurisdiction, "depends on an affiliation between the forum and the underlying controversy." *Id.* (internal citations omitted). "Specific jurisdiction exists when the claim arises from or relates to conduct purposely directed at the forum state," *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007), such that the defendant " 'should reasonably anticipate being haled into court' in that forum." *Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir. 2001) (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)).

Upon a jurisdictional challenge, the plaintiff has the burden of demonstrating the facts, by affidavits or other competent evidence, that establish personal jurisdiction. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (2009). The plaintiff "need only establish a prima facie case of personal jurisdiction," and as indicated above, is entitled to have its allegations taken as true and all disputed facts construed in its favor. *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155 (3d Cir. 2010).

In its moving brief, IMT attacks the SAC for "fail[ing] to allege any conduct by IMT that would create a substantial connection with New Jersey," claiming that the only allegations referencing New Jersey concern the fact the SPS is headquartered there. (Moving Br. 13-14.) In its opposition SPS argues that "IMT unilaterally directed its conduct towards New Jersey by soliciting employees from a New Jersey-based company, with New Jersey-based employees, who had New Jersey-based employment agreements and adhered to policies promulgated and business decisions made in New Jersey." (Opp. Br. 19.)

In their briefs and at oral argument, both sides invoked *Calder v. Jones*, 465 U.S. 783 (1984), which established the *Calder* effects test to be applied in intentional tort cases when

determining whether specific jurisdiction exists. In *IMO Industries, Inc. v. Kiekert AG*, the Third Circuit construed the *Calder* effects test to require that: (1) that the defendant committed an intentional tort; (2) that the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) that the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. 155 F.3d 254, 265–66 (3d Cir. 1998).

The thrust of IMT's 12(b)(2) challenge is that the allegations of the SAC fail to satisfy the third requirement. IMT stresses that it is the defendant's contact with the forum—not the plaintiff's—that is relevant to the analysis. According to IMT, the SAC alleges only those contacts that SPS has with New Jersey. (Moving Br. 14.) IMT accuses SPS of attempting to "sidestep" its burden when SPS argues IMT "can be deemed to have targeted New Jersey because it knew that SPS was headquartered [there]." (*Id.*) IMT argues that this is in direct contravention of Third Circuit law laid down in *IMO*: "Simply asserting that the defendant knew that the plaintiff's principal pace of business was located in the forum would be insufficient itself to meet this requirement. The defendant must manifest behavior intentionally targeted at and focused on the forum for *Calder* to be satisfied." 155 F.3d at 265 (internal citations omitted).

The facts in the *IMO Industries* decision are as follows. Imo Industries ("Imo"), a multinational corporation with its principal place of business in New Jersey, sued Kiekert AG, a German corporation, for tortiously interfering with Imo's attempt to sell its wholly-owned Italian subsidiary to a French corporation that was a Kiekert competitor. *Id.* at 256. Imo alleged that Kiekert's threat to revoke its license agreement with the Italian subsidiary effectively derailed the sale. *Id.* Imo argued that the district court could properly exercise jurisdiction over Kiekert based on Kiekert's correspondences with both Imo's Italian subsidiary and the New York investment

firm representing Imo in the sale. *Id.* at 266-67. The district court granted Kiekert's motion to dismiss for lack of personal jurisdiction, and Imo appealed.

The Third Circuit upheld the district court's dismissal for lack of jurisdiction because "the focus of the dispute—i.e. the proposed sale of an Italian company to a French company and a claim of rights by a Germany company pursuant to a license agreement . . . all appear to be focused outside the forum." *Id.* at 256. The court initially noted that specific jurisdiction was not established "on the basis of Kiekert's alleged contacts with the forum alone," *id.* at 259, finding that "the communications [were] limited in quantity" and there was no "direct act of 'entry' into New Jersey by Kiekert," because Kiekert mailed the letters to Italy and New York, the meetings occurred in Canada and Germany, and Imo initiated the phone calls, *id.* at 259, n.3. The court also stated concern that the aspect of foreseeability was lacking, noting that "[i]t was perfectly reasonable . . . for Kiekert to believe when it entered into the [license agreement with an Italian company in Germany, which was to be governed by German law] that it would be able to enforce its rights under the contract without being subject to the jurisdiction of the New Jersey courts." *Id.*

The court moved on to consider whether the application of *Calder* would change the outcome, noting that "under *Calder* an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *Id.* at 260. Under its *Calder* analysis, the court again found that Kiekert's written correspondence, sent to Italy and New York, was insufficient to demonstrate that Kiekert expressly aimed its conduct at New Jersey. *Id.* at 267. Likewise, the court "fail[ed] to see how [the calls Imo placed to Kiekert in response to the letters] demonstrate[d] Kiekert's targeting of New Jersey as the situs of its

tortious acts." *Id.* The court held that because "Imo cannot demonstrate that Kiekert expressly aimed its tortious conduct at New Jersey . . . Imo cannot rely on the *Calder* effects test to confer specific jurisdiction based on Kiekert's allegedly intentional tortious conduct." *Id.*

The facts alleged in the SAC are markedly distinct from *IMO Industries*. As pleaded in the SAC, the alleged corporate raiding of a New Jersey company's video conferencing business unit falls squarely within this forum. SPS asserts that IMT systematically dismantled Providea, the video conferencing business unit that SPS acquired in 2012, and then reassembled it within IMT. SPS alleges that IMT accomplished this corporate raid by hiring Luttinger, former-SPS employee and senior vice president of Providea, after SPS fired him in 2015. SPS contends that when Luttinger went to work at IMT to lead its new video conferencing business unit, he remained bound by his two-year non-compete and non-solicitation agreement signed with SPS. Luttinger openly touted the creation of "Providea 2.0" at IMT. His first recruit was SPS's director of human resources, Teri Bevan, and swiftly and successfully after bringing Bevan on board at IMT, Luttinger recruited at least nineteen of his former SPS Providea employees.

In its moving brief, IMT cites to a recent application of *IMO Industries* in *Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166 (D.N.J. 2016) (Arleo, J.), where the court dismissed a complaint against the corporate defendant for lack of jurisdiction. The Court recognizes that *Display Works* shares a similar framework with the present case insofar as Display Works sued corporate defendant Derse for tortious interference, breach of contract, and defamation based on its hiring of Bartley, a former-Display Works employee subject to a restrictive covenant agreement. However, personal jurisdiction requires a fact-intensive analysis, and there is a significant difference between the corporate conduct challenged in these two lawsuits. The *Display Works* court characterized Derse's alleged conduct as "[s]oliciting a variety of customers,

soliciting some employees, and defaming Display Works." *Id.* at 181. As described above, SPS alleges a qualitatively different caliber of conduct by IMT—conduct that resulted in SPS's loss of its video conferencing unit, not merely "some employees" and a "variety of customers."

The SAC further argues that all SPS employees reported to its New Jersey headquarters, received payroll checks and benefits from SPS administered through SPS's New Jersey headquarters, and were subject to SPS confidentiality obligations that survived the termination of employment. IMT attempts to limit the import of those facts as merely "underscore[ing] the fact that SPS is headquartered in New Jersey." (Moving Br. 13-14.) But in context they establish something else that is very relevant to the jurisdictional inquiry: the employees who made up the videoconferencing unit that migrated to IMT were assets fully tied to New Jersey by the indices of their employment. By targeting them, IMT targeted New Jersey assets. The SAC essentially pleads the loss of an SPS profit center, and by reciting the ties to New Jersey inherent in employment within that profit center, SPS has effectively pleaded specific jurisdiction. That IMT targeted that profit center is, of course, the heart of the complaint, satisfying the third requirement of the *Calder* effects test that "the defendant must manifest behavior intentionally targeted at and focused on the forum for *Calder* to be satisfied." *IMO Industries*, 155 F.3d at 265. What *IMO Industries* instructs—and what IMT's arguments ignore—is that *Calder* provides an enhancement to "otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *Id.* at 260.

Moreover, SPS alleges that in addition to Luttinger, at least seven of the employees IMT recruited were subject to non-solicitation agreements, two employees had agreements containing New Jersey choice of law and forum selection clauses, and two employees lived in New Jersey.

Finally, Luttinger, the chief person executing IMT's plan to excise Providea from SPS, knew all of this and was himself subject to restrictive covenants with SPS.

Accepting these facts as true, the Court concludes that SPS has sufficiently demonstrated that IMT, through Luttinger, expressly aimed its conduct at New Jersey, such that New Jersey can be said to be the focal point of IMT's alleged tortious activity. Further, because Luttinger himself was party to restrictive covenants with SPS, the foreseeability mandated by due process— "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp.*, 444 U.S. at 297—is amply present here. Thus, the Court finds that SPS has satisfied its burden under *International Shoe* and the *Calder* effects test, permitting this Court to exercise specific jurisdiction over IMT.

### C. IMT's Motion to Dismiss Under Rule 12(b)(6)

IMT alternatively argues that the SAC must be dismissed for failure to state a claim. To survive dismissal where the sufficiency of pleadings is challenged, "a complaint must contain sufficient factual matter, accepted as true" to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### 1. Counts I and II: Tortious Interference

Counts I and II of the SAC assert tortious interference claims: tortious interference with contractual and advantageous relations (Count I) and tortious interference with prospective economic gain (Count II). Under New Jersey law,[4] the elements of these common law torts

---

[4] The parties briefed and relied on New Jersey common law, which the Court applies.

closely track each other, differing only in that tortious interference with contractual and advantageous relations requires a contractual relationship.

To allege a claim for tortious interference with contractual relations, a plaintiff must prove: "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." *Dello Russo v. Nagel*, 358 N.J. Super. 254, 268 (App. Div. 2003).

The tort of intentional interference with prospective economic gain "proscribes inducing a third person not to continue a prospective relation." *MacDougall v. Weichert*, 144 N.J. 380, 403 (1996). To sustain a claim, the complaint must "allege facts that show some protectable right—a prospective economic or contractual relationship" and the facts must give rise to "a reasonable expectation of economic advantage." *Id.* at 404. The remaining three elements mirror those for a tortious interference with contractual relations claim. *Id.*; *see also EZ Sockets, Inc. v. Brighton-Best Socket Screw Mfg. Inc.*, 307 N.J. Super. 546, 558 (Ch. Div. 1996), *aff'd*, 307 N.J. Super. 438 (App. Div. 1997). "Liability of a competitor depends upon whether the means used to compete are unlawful." *C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J. Super. 168, 174 (Law. Div. 1989). The law does not protect against "privileged competitive efforts." *EZ Sockets, Inc.*, 307 N.J. Super. at 558.

In its moving brief, IMT claims that the SAC fails to allege facts showing that IMT engaged in unlawful conduct. (Moving Br. 21.) Absent wrongful conduct, IMT argues that it was "entirely within its rights to [hire SPS employees]. 'The mere persuasion of an employee to change jobs is not wrongful . . . .' " (*Id.*, quoting *Avtec Indus., Inc. v. Sony Corp. of Am.*, 205 N.J. Super. 189, 193 (App. Div. 1985).) IMT discusses *Cardionet, Inc. v. Medi-Lynx Cardiac*

*Monitoring, LLC* in support of this argument. No. 15-8592, 2016 WL 4445749, at *1 (D.N.J. 2016) (Shipp, J.). There, Cardionet asserted a claim for tortious interference with employment relations against Medi-Lynx after two former Cardionet employees successfully solicited ten current employees to work for Medi-Lynx, a competitor. The court dismissed the claim, finding that Cardionet "fail[ed] to allege any facts in the Complaint regarding the circumstances surrounding [Medi Lynx's] contacts with [Cardionet's] employees," let alone facts that showed defendants used improper means to recruit plaintiff's employees. *Id.* at *3 ("These facts do not show that [Medi-Lynx] acted without justification or excuse when they hired [Cardionet] employees.").

But here, the SAC is replete with factual allegations about the unlawful means IMT deployed to bring SPS's video conferencing unit under IMT ownership. Principally, SPS alleges that IMT used Luttinger, a former SPS employee, to execute its employee piracy scheme. Importantly, Luttinger began this process only thirteen months into a two-year restrictive covenant that barred him from working for an SPS competitor and soliciting SPS employees and customers. SPS asserts that IMT was aware of and disregarded Luttinger's contractual agreements, and hired him to recruit his former colleagues at SPS's Providea unit to establish "Providea 2.0" at IMT.

According to the SAC, IMT's alleged tortious interference resulted in SPS's loss of at least 20 employees to IMT. Seven of Luttinger's SPS recruits were subject to one-year non-solicitation agreements, including SPS's HR director Terri Bevan, Luttinger's first recruit. Further, all twenty employees continued to be bound by confidentiality obligations even after they terminated employment with SPS, yet IMT "actively encouraged and even rewarded former SPS employees to misappropriate and use SPS's confidential information for the benefit of IMT."

(SAC ¶ 102.)  For example, the exhibits accompanying SPS's April 11 letter (D.E. 60) include email communications from SPS employees that defected to IMT concerning business they conducted on behalf of IMT while still working for SPS.  (*See, e.g.,* D.E. 60-1, Ex. A; D.E. 60-2, Ex. B; D.E. 60-5, Ex. E.)  On August 28, 2017, former SPS employee Brian Grace sent the following email to an SPS customer:

> I hope this email finds you well. I'm sure you noticed my email address has changed and I'm no longer with SPS. Chris Heimlich asked me to reach out to you in regard to giving you updates on what has changed with communications technology since we last talked, *as well as give you an overview of the new company that we are working for.* Let me know if you have some time to squeeze me into your schedule in the next few weeks. I'd love to come on-site and talk about the future of collaboration at [company]. Thank you!

(D.E. 60-8, Ex. H (emphasis added).)  At the time this email was sent, Chris Heimlich was employed at SPS.

Other emails show former SPS employees circulating SPS templates and documents once at IMT.  One email suggests that a former SPS employee used an SPS template "yet to be IMT'ized."  (D.E. 60-6, Ex. F.)  An earlier email in that same chain states "This quote says 'SPS Services'. . . oops!  Please revise if not too late."  (*Id.*)  A little over a month after Brian Grace quit SPS to work for IMT, he forwarded himself a 38-page document titled "Example [Scope of Work] version 2.0," which SPS describes as a "detailed form used by SPS."  (D.E. 60, April 11 Ltr.; D.E. 60-9, Ex. I.)[5]

---

[5] As earlier indicated, these factual supports for the substantive claims came to light by means of discovery that was ongoing during the pendency of this motion.  (*See* D.E. 59, 60.)  The Court's review of the docket establishes that SPS made regular efforts to hold IMT to discovery deadlines, with middling success due to IMT's resistance.  As discussed at oral argument, unringing the bell after SPS brought the highly relevant emails to the Court's attention would be impossible and impractical.  While not elegant, the zigzag route taken by the parties adds up to a body of evidence on jurisdictional facts that would have been adduced had there been targeted discovery and a hearing under Fed. R. Civ. P. 12(b)(2).  These same facts inform the Rule 12(b)(6) analysis.

Discovery will reveal more specifically which of these allegations involve interference with contractual relationships, and which involve prospective economic or contractual relationships, but at the pleading stage, the Court is satisfied that SPS has sufficiently stated its tortious interference claims. Counts I and II survive the motion to dismiss.

### 2. Counts III & IV: Misappropriation and Conversion

Counts III and IV assert that IMT engaged in misappropriation and conversion of SPS's confidential information. IMT argues that these counts cannot survive a motion to dismiss because SPS fails to reasonably identify the alleged confidential information at issue and does not allege any facts that permit "the inference that IMT has obtained or otherwise made use of any such information." (Moving Br. 22-23.) In response, SPS points to paragraphs 131 to 133 of the SAC, which set forth a comprehensive description of the confidential information that IMT allegedly misappropriated and converted. Additionally, SPS alleges that it "entrusted its confidential information . . . to its key sales and operational team members, including each of the twenty employees that IMT to date has pirated away from SPS's employ." (SAC ¶ 28.) IMT replies that SPS has merely supplied a "boilerplate definition of 'Confidential Information' . . . contained in its employee handbook," an "attempt[] to define the term as broadly as possible in hopes that discovery might find some evidence to support a claim." (Reply 13.)

The Court does not take issue with SPS's defining 'confidential information' by way of the language in its Employee Handbook. Presumably, the handbook captures the various types of confidential information that SPS foresees its employees will receive access to through their employment. SPS alleges that IMT, through Luttinger and the SPS employees he recruited to IMT, misappropriated and converted SPS's confidential information "to SPS's substantial

detriment" and despite the continuing confidentiality obligations of IMT's new employees. These allegations are bolstered by the April 11 discovery submissions discussed in detail above.

No heightened pleading standard applies to common law misappropriation and conversion claims; the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Accordingly, the Court finds that SPS's claims for misappropriation and conversion of confidential information satisfy the pleading requirements of Fed. R. Civ. P. 8(a) and survive IMT's motion to dismiss.

### 3. Count V: Unfair Competition

IMT challenges SPS's unfair competition claim as duplicative of SPS's tortious interference claim, and argues that, consequently, the unfair competition claim "should be dismissed for the same reasons." (Moving Br. 24, citing *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 786 (D.N.J. 1995) (Brown, J.).) IMT also cites to *CRA, Inc. v. Ozitus International, Inc.,* No. 15-5632, 2017 WL 2779749, at *11 (June 27, 2017) (Simandle, J.), where the court dismissed an unfair competition claim as duplicative of the tortious interference claims because the two claims shared the same factual basis.

In response, SPS asserts that under New Jersey law, unfair competition "is a general rubric which subsumes various other causes of action," and accordingly, "demonstrating tortious interference is not the only avenue to plead a cognizable [unfair competition] claim." (Opp. Br. 29, citing *C.R. Bard, Inc.*, 235 N.J. Super. at 172.) Next, SPS argues that its unfair competition claim, unlike those in the cases provided by IMT, is not "premised solely upon the factual allegations" supporting its tortious interference claim: "SPS also alleges that 'IMT actively encouraged and even rewarded former SPS employees to undermine SPS's customer relationships

and reputation in the marketplace.' " (Opp. Br. 29-30, quoting SAC ¶ 99.) SPS argues that this "distinct allegation of culpable conduct" supports an independent unfair competition claim, and is "specifically incorporated into the Fifth count of SPS's [SAC]." (*Id.* 30, citing SAC ¶ 141.)

In *Coast Cities*, the district court did not dismiss the unfair competition claim for being duplicative of other claims, but rather granted dismissal because the claims on which "plaintiff predicate[d] its unfair competition claim" had already been dismissed. 912 F. Supp. at 786. In fact, the court's reasoning supports preserving an unfair competition claim that is based on factual allegations of tortious interference or breach of good faith and fair dealing, where those claims survive:

> While the elements for unfair competition are not entirely clear, it seems likely that New Jersey law would find unfair competition where there has been tortious interference, which requires a demonstration of malice, or upon a finding of breach of good faith and fair dealing. This observation derives from the standards for tortious interference and breach of good faith, measured against the objective of unfair competition, which is to reinforce fair dealing and scrupulous conduct on the commercial level.

*Id.*

Similarly, in *CRA, Inc.*, the defendant challenged CRA's unfair competition claim as duplicative of its tortious interference claim, which the district court preserved. Having determined that the factual basis for CRA's unfair competition claim was, in fact, the same as for its tortious interference claim, the court ruled that "the better course [was] to dismiss the unfair competition claim as duplicative." 2017 WL 2779749, at *11. Central to its ruling was the fact that not only did the claims appear identical, but the plaintiff had not disputed they were the same. *Id.* In contrast, SPS points to its allegation that "IMT actively encouraged and even rewarded former SPS employees to undermine SPS's customer relationships and reputation in the marketplace" (SAC ¶ 99) as a "distinct allegation of culpable conduct" that supports an

independent unfair competition claim. (Opp. Br. 30.) This dispute, in addition to the recognized "amorphous nature of unfair competition," *Coast Cities*, 912 F. Supp. at 786, with its aim to "promote higher ethical standards in the business world," *Ryan v. Carmona Bolen Home for Funerals*, 341 N.J. Super. 82, 92 (2001), militate against dismissing of SPS's unfair competition claim at this early stage of litigation. Count V survives IMT's motion to dismiss.

III.     **Conclusion**

For the reasons set forth above, the Court denies IMT's motion to dismiss SPS's SAC for lack of subject matter jurisdiction. Additionally, the Court denies IMT's motion to dismiss the SAC for lack of personal jurisdiction. Finally, the Court denies IMT's motion to dismiss the SAC for failure to state a claim. IMT's appeal of Magistrate Judge Waldor's order denying IMT's requested stay of discovery during the pendency of its motion to dismiss (D.E. 43) is denied as moot. An appropriate order will issue.


                                                      /s/ Katharine S. Hayden
Date: May 10, 2019                                    Katharine S. Hayden, U.S.D.J.